E-FILED
Thursday, 15 October, 2020 04:20:24 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JAMES R. HAUSMAN, individually and derivatively on behalf of THE GOLD CENTER, INC., an Illinois Corporation, | ) | |
| Plaintiff, | ) | |
| v. | ) | No.: |
| TODD GREEN, JOSHUA WAGONER and THE GOLD CENTER, INC., an Illinois Corporation, | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff, JAMES R. HAUSMAN, by his attorneys, Adam L. Saper and Michael D. Morehead of Hinshaw & Culbertson LLP, for his Complaint against Defendants, TODD GREEN, JOSHUA WAGONER and THE GOLD CENTER, INC., alleges:

**NATURE OF THIS ACTION**

1. This action is brought by Jim Hausman, a minority shareholder of GCI, a closely-held Illinois corporation, seeking redress derivatively on behalf of The Gold Center, Inc. ("GCI"), from GCI's majority shareholder, Todd Green ("Green") and Joshua Wagoner ("Wagoner"), another GCI director and officer, as a result of their breaches of fiduciary duty, self-dealing, usurping corporate opportunities, corporate waste, gross mismanagement, and intermingling of funds with a corporation separately owned and controlled by Green. Hausman, individually, seeks redress for oppression, and seeks an accounting of, among other things, GCI cash transfers, payments, and loans made to and received by Green's other companies.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that:

(a) Hausman is a citizen of the State of Wisconsin;

(b) Green is a citizen of the State of Illinois;

(c) Wagoner is a citizen of the State of Illinois;

(d) GCI is a citizen of the State of Illinois, having been incorporated in Illinois and having its principal place of business in Illinois; and

(e) The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (2), in that a) all Defendants reside in the Central District of Illinois, and b) a substantial part of the events giving rise to this action occurred in the Central District of Illinois.

**PARTIES**

4. At all relevant times continuing through the present, Hausman has owned 20% of the shares of GCI, and has been one of three members of GCI's Board of Directors.

5. At all relevant times continuing through the present, Green has owned 80% of the shares of GCI, and has been one of three members of GCI's Board of Directors, and the President of GCI.

6. At all relevant times continuing through the present, Wagoner has been one of three members of GCI's Board of Directors, the Secretary of GCI, and an agent of Green with actual authority to engage in the conduct described herein and such conduct was also ratified by Green. Between February 1, 2014 and the latter part of 2016, Wagoner was also employed by GCI as its General Manager.

7. GCI is an Illinois corporation formed by Hausman on June 1, 1978. GCI is joined herein as a nominal defendant, in accordance with Fed.R.Civ.P. 19, to enable the Court to award complete relief among the parties.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Stock Purchase

8. Prior to January 31, 2014, Hausman was the sole shareholder of GCI.

9. On January 31, 2014, and February 1, 2014, Hausman and Green entered into a series of agreements pursuant to which Green obtained a majority interest in, and control over GCI.

10. Among those agreements was a Stock Purchase Agreement ("SPA") dated January 31, 2014, pursuant to which Hausman sold and transferred to Green 80% of the common shares of GCI (600 of the 750 shares), while Hausman retained 20% (150 shares) of the GCI common shares.

11. Also among those agreements, and in accordance with the SPA, was a Shareholders Agreement dated January 21, 2014, pursuant to which Green, Wagoner, and Hausman would comprise the Board of Directors of GCI.

### GCI's Business

12. GCI operates a multi-faceted precious metals business, including buying and selling gold, silver, platinum, palladium, bullion in all forms, scrap gold, diamonds, rare coins and currency, sterling silver and watches. Its inventory includes coins from the United States Mint, the Royal Canadian Mint, and other premier mints. GCI also melts and refines precious metals.

13. GCI is one of only twelve licensees authorized by the U.S. Department of Treasury to act as an Authorized Purchaser of bullion coins issued by the U.S. Mint. As one of the U.S. Mint's twelve Authorized Purchasers, GCI purchases bullion coins directly from the U.S. Mint and then sells these to wholesalers, financial institutions, and other secondary retailers.

14. Hausman, as the original founder of GCI, has over forty years' experience in the operation of a precious metals business, including buying and selling gold, silver, platinum, diamonds, rare coins and currency, sterling silver, and watches; transporting precious metals; storing precious metals for others; and assaying and refining precious metals.

15. Among the agreements entered into between Hausman, Green and GCI was an Employment Agreement dated January 31, 2014, pursuant to which Hausman was to serve as the President of GCI and to act as an advisor to the GCI General Manager and staff of GCI; work with Green to educate, train and help facilitate the business of GCI on a day-to-day basis and act as a liaison to the U.S. Mint, suppliers and customers of GCI; and perform other services as assigned, including buying and selling numismatic items for GCI inventory, buying and selling scrap precious metal, bullion, coins, bars, diamonds and numismatic items, metal trading, hedging transactions and promoting the products and services of GCI.

**Hausman Grows Concerned About the Management of GCI**

16. Hausman became concerned about the manner in which GCI's management was conducting GCI's business. In one circumstance, Hausman discovered that GCI had inadvertently accepted consignment of counterfeit "rare" coins for re-sale. In a separate circumstance, Hausman discovered GCI had shipped $900,000.00 worth of silver to a purported buyer in California, without retaining a security interest or lien, and the purported buyer never paid for the silver.

17. By letter dated February 15, 2017, Hausman demanded that the GCI Board convene to consider certain resolutions proposed by Hausman to address management issues.

18. The GCI Board of Directors convened on March 14, 2017 to consider Hausman's resolutions. Green and Wagoner, who control the Board, voted against the resolutions in their entirety.

**<u>Green and Wagoner's Plan To Relocate GCI Business Operations</u>**

19. At least in part to avoid Hausman's scrutiny of GCI's business practices, Green and Wagoner determined to move the majority of GCI's business operations from Springfield, Illinois to Naples, Florida.

20. At a meeting of the GCI Board of Directors held on June 1, 2018, Green provided Hausman with a copy of a final draft lease (the "Naples Lease") with Baysun LLC ("Baysun") as lessor, for a portion of a building located at 2400 Tamiami Trail North, Naples, Florida (the "Naples Property"). Green and Wagoner voted in favor of GCI executing the Naples Lease, and Hausman voted against it. However, as Hausman would later discover, GCI had already executed the Naples Lease eight months earlier, on October 4, 2017.

**<u>Green and Wagoner Usurp GCI's Corporate Opportunity to Purchase the Naples Property.</u>**

21. Unbeknownst to Hausman at the time, three days after the purported vote to approve the execution of the lease, on June 4, 2018, the lessor Baysun transferred ownership of the Naples Property to a company Green formed on May 31, 2018, 2400 Tamiami Trail North LLC ("Tamiami LLC"). In other words, one day *before* the board meeting at which Green proposed that GCI enter into the lease with Baysun, Green had already formed Tamiami LLC for the purpose of it receiving title to the Naples Property. Tamiami LLC also executed an attornment by which it assumed the Naples Lease effective June 4, 2018.

22. Green and Wagoner, in addition to actively misleading and deceiving Hausman concerning the Naples Lease, concealed from Hausman, while under a duty to speak, that there was an opportunity for GCI to buy the Naples Property from Baysun. This opportunity was not presented to GCI. Green and Wagoner usurped this corporate opportunity by causing Tamiami

LLC to acquire title to the Naples Property, which excluded Hausman from any interest in the Naples Property.

23. By the end of 2018, Green and Wagoner had relocated the GCI Illinois operations and moved the majority of GCI's business inventory, equipment and personnel to Naples, Florida.

**Green and Wagoner Approve a Self-Interested Transaction in Bad Faith**

24. The terms of the Naples Lease with Baysun, which had been assumed by Tamiami LLC, permitted GCI to build out at its own expense an additional five hundred square feet of space at the Naples Property with no initial increase in rental cost.

25. Without notice to Hausman, Green and Wagoner caused GCI to voluntarily relinquish to Tamiami LLC, GCI's right to occupy the additional five hundred square feet of space at no charge. Through an amendment to the Naples Lease made effective December 31, 2018, and signed by Green on behalf of both the landlord and tenant, GCI voluntarily agreed to pay additional rent for the five hundred square feet it was already contractually entitled to occupy for free. This transaction unjustly enriched Green and his company, at the expense of GCI.

**The Acquisition of "Naples Gold & Silver"**

26. At a special meeting of the GCI Board of Directors held on January 18, 2019, Green and Wagoner voted to approve GCI to enter into an asset purchase agreement to acquire the name and good will of "Naples Gold & Silver" ("NG&S") and "Naples Guns & Ammo" ("NG&A"), which were owned by RICMARFL LLC.

27. Hausman voted against the acquisition, and objected to a lack of material information concerning the market value of the assets of NG&S and NG&A.

28. Hausman also specifically objected to GCI purchasing the name and good will of NG&A, based on concerns over the combination of GCI's precious metals business and the operation of a guns and ammo business.

29. Unbeknownst to Hausman at the time, on January 15, 2019, three days prior to the board meeting at which Green proposed to buy these assets, Green and Wagoner had already caused GCI to execute a contract to purchase these assets for $250,000. At the January 18, 2019 special meeting of the GCI Board of Directors, neither Green nor Wagoner informed Hausman that GCI had already executed a contract to purchase these assets.

30. By January 15, 2019, three days prior to the January 18, 2019 board meeting, Green Wagoner and Dean Trapani ("Trapani"), GCI's General Manager, had already formed 2400 GC Tamiami Trial North Inc. ("Tamiami Inc."). Green and Wagoner are directors and officers of Tamiami Inc.

31. Green, Wagoner and Trapani caused Tamami Inc. to acquire the NG&A assets, and caused GCI to purchase the NG&S assets.

32. Green and Wagoner arbitrarily and capriciously allocated only $12,500 of the total purchase price of $250,000 for Tamami Inc.'s purchase of the assets of NG&A, while allocating the remaining $237,500 to GCI's purchase of the NG&S assets.

33. The fair market value of the NG&S name and good will purchased by GCI was a small fraction of the $237,500 paid by GCI to acquire them; particularly given the fact that Green and Wagoner had no intention to continue to operate NG&S as an ongoing business. The purchase of these assets lacked any fundamental or documented business advantage, it was an obviously bad deal for GCI, and Green and Wagoner exercised bad faith in approving it.

**Tamiami Inc. Usurps "The Gold Center" Name**

34. On December 21, 2018, Tamiami Inc., the separate corporate entity owned and controlled by Green, Wagoner and Trapani, registered the assumed name "The Gold Center" with the Florida Secretary of State.

35. GCI was designated by the United States Mint as an Authorized Purchaser of American Eagle Silver Bullion Coins ("Silver Eagles"). There are currently only twelve Authorized Purchasers of U.S. Mint Silver Eagles in the world. Prior to Hausman's sale of a majority interest in GCI to Green, GCI's purchase of Silver Eagles from the U.S. Mint for sale to secondary market purchasers and dealers was a lucrative part of its business.

36. Upon information and belief, Green and Wagoner caused the U. S. Mint to change its publicly available listing of Authorized Purchasers of Silver Eagles from "The Gold Center, Inc." to "The Gold Center." This was followed by a precipitous decline in GCI revenues derived from the sale of Silver Eagles to secondary market purchasers and dealers.

**Undisclosed Wires, Payments, and Loans to Tamiami Inc.**

37. On information and belief, GCI has never established or opened a Florida based banking account in order to conduct financial transactions from its Naples Florida business location.

38. Beginning in January 2019, Green and Wagoner caused or allowed GCI to transfer by check or wire cash funds from GCI's corporate account at Carrolton Bank to Tamiami Inc., as follows:

(a) $27,665 on January 8, 2019, coded in GCI's General Ledger as "Florida;"

(b) $27,665.00 on January 14, 2019, coded in GCI's General Ledger as "Cash for vault;"

(c) $50,000 on January 18, 2019, coded in GCI's General Ledger as "Florida payroll;"

(d) $33,707.61 on February 4, 2019, 20,000.00 of which was coded in the GCI General Ledger as “Cash for vault;”

(e) $12,773.07 on February 15, 2019, coded in GCI’s General Ledger as “Payroll;”

(f) $12,807.55 on March 4, 2019, coded in the GCI General Ledger as “Payroll;”

(g) $29,762.10 on March 18, 2019, coded in GCI’s General Ledger as “Payroll;”

(h) $24,000 on March 19, 2019, coded in GCI’s General Ledger as “Cash for vault;”

(i) $28,498,89 on April 1, 2019, coded in GCI’s General Ledger as “Florida Payroll;”

(j) $20,000 on April 11, 2019, coded in GCI’s General Ledger as “Cash for vault;”

(k) $20,322.92 on April 15, 2019, coded in GCI’s General Ledger as “Florida Payroll;”

(l) $17,676.97 on April 26, 2019, coed in GCI’s General Ledger as “Payroll;”

(m) $20,000 on May 7, 2019, coded in GCI’s General Ledger as “Cash for vault;”

(n) $57,097.46 on May 13, 2019, coded in GCI’s General Ledger as “Payroll;”

(o) $12,631.23 on May 16, 2019, coded in GCI’s General Ledger as “Partial Bonus;”

(p) $20,000 on May 20, 2019, coded in GCI’s General Ledger as “Cash for vault;” and,

(q) $15,718.60 on May 23, 2019, coded in GCI’s General Ledger as “Fl payroll.”

39. There is no legitimate business justification for GCI to run its Florida payroll and the funding of general operations through Tamiami Inc; Green, Wagoner, and Trapani’s separate company which ostensibly conducts business only as a federally-licensed guns and ammo dealer.

40. According to GCI records, since January 1, 2019, GCI has “loaned” at least $139,977.76 to Tamiami Inc. These GCI loans to Tamiami Inc. were never presented to or approved by the GCI Board of Directors, or disclosed or adequately explained to Hausman by either Green or Wagoner.

**Payments from GCI to Green’s Auto Dealership, Green IT and Green Employees**

41. Beginning in October 2018 and continuing through at least April 23, 2019, Green and Wagoner caused or allowed GCI to pay a total of $107,841.94 through a combination of payments to Green Hyundai and separately to persons employed by Green Hyundai, purportedly for information technology services to set up GCI’s recently relocated Illinois operations and the new Florida operations.

42. Green and Wagoner have failed and refused to disclose the services performed in connection with these self-interested transactions, or to justify the use of Green Hyundai or its employees when these services could have been performed by other local information technology vendors.

**Tamiami Inc. Buys $2 Million of American Eagle Gold Coins From GCI**

43. On March 4, 2019, GCI purchased current year American Eagle Gold Coins (“Gold Eagles”) valued at $662,800.

44. On March 13, 2019, Tamiami Inc. deposited $669,225 into GCI’s account at Carrolton Bank. The GCI General Ledger coded this transaction as GCI’s sale of current year Gold Eagles to Tamiami Inc., which ostensibly conducts business only as a federally-licensed guns and ammo dealer.

45. On March 18, 2019, GCI purchased additional current year Gold Eagles valued at $669,850.

46. On March 22, 2019, Tamiami Inc. deposited $676,250 into GCI's account at Carrolton Bank. The GCI General Ledger coded this transaction as GCI's sale of current year Gold Eagles to Tamiami Inc., which ostensibly conducts business only as a federally-licensed guns and ammo dealer.

47. On May 14, 2019, GCI purchased additional current year Gold Eagles valued at $660,000.

48. On May 20, 2019, Tamiami Inc. deposited $666,750 into GCI's account at Carrolton Bank. The GCI General Ledger coded this transaction as GCI's sale of current year Gold Eagles to Tamiami Inc., which ostensibly conducts business only as a federally-licensed guns and ammo dealer.

49. Neither Green nor Wagoner advised Hausman of these transactions or the reason why Tamiami Inc., which ostensibly conducts business only as a federally-licensed guns and ammo dealer, purchased over $2 million of Gold Eagle coins from GCI.

50. Upon information and belief, Tamiami Inc. then sold over $2 million of Gold Eagle coins that it had purchased from GCI to a third party purchaser.

51. Neither Green nor Wagoner advised Hausman of the identity of the third party who ultimately purchased over $2 million of Gold Eagle coins that Tamiami Inc. had initially purchased from GCI.

52. There is no legitimate business justification for GCI to sell Gold Eagle coins through Green, Wagoner and Trapani's separate company, Tamiami Inc., which ostensibly conducts business only as a federally-licensed guns and ammo dealer.

53. Neither Green nor Wagoner provided Hausman with any information to demonstrate the fairness or advantage of selling these Gold Eagle coins to third parties through Tamiami Inc.

**Tamiami Inc's use of GCI's Naples Retail Space**

54. Upon information and belief, since at least March of 2019, Tamiami Inc. has conducted its federally-licensed guns and ammo business operations from GCI's retail space located within the Naples Property.

55. Upon information and belief, Tamiami Inc's business operations use approximately 153 square feet of the GCI retail space at the Naples Property.

56. Green and Wagoner have never caused Tamiami Inc. to enter into any formal lease contract for use of the GCI retail space; and instead have indicated that there is an informal agreement for Tamiami Inc. to pay GCI rent in the sum of $6,000 per year.

57. The Carrolton Bank account records do not reflect the receipt of any rental payments having been actually paid by, or received from, Tamiami Inc.

**Tamiami Inc's use of GCI Funded Credit Line**

58. GCI has historically established, maintained, and utilized a revolving line of credit provided by Carrolton Bank, in order to provide temporary liquidity funding of its business operations until actual receipt of payment on accounts receivables. As of August 30, 2020, GCI's loan draw on its Carrolton Bank revolving line of credit was in an amount of $10,250,000.00.

59. In July, 2020, GCI's 2019 Financial Statement and Independent Auditor's Report was issued and released. The GCI 2019 Independent Auditor's Report for the first time identified that during 2019, GCI had provided Tamiami Inc. with a revolving line of credit.

60. As of December 31, 2019, Tamiami Inc.'s loan draw on the GCI funded revolving line of credit was in an amount of $177,408.00.

61. As of August 31, 2020 Tamiami Inc.'s loan draw on the GCI funded revolving line of credit was in the amount of $201,716.70.

62. Tamiami Inc.'s revolving line of credit from GCI allegedly bears interest at the rate of 4% per annum on the outstanding balance.

63. Neither Green nor Wagoner advised Hausman of the GCI funded Tamiami Inc. revolving line of credit, the terms and conditions governing that credit line, or the reason why Tamiami Inc., which ostensibly conducts business only as a federally-licensed guns and ammo dealer, did not establish a traditional line of credit with its own bank or financial institution.

64. There is no legitimate business justification for GCI to provide Tamiami Inc. with a revolving line of credit.

65. Neither Green nor Wagoner provided Hausman with any information to demonstrate the fairness or advantage to GCI for providing Tamiami Inc. with a revolving line of credit.

**Undisclosed Loan From Green to GCI to Fund Purported Relocation Costs**

66. GCI financial statements issued in July 2019 for the first time reported a current expense liability in the amount of $1,300,450.80, in relation to a purported loan from Green to GCI in order to fund the GCI Naples Property and the new Springfield, Illinois operations location build-out and business relocation moving costs.

67. Neither Green nor Wagoner have disclosed or explained to Hausman the specific build-out and relocation cost items, or the need or existence for a loan from Green to fund them.

68. In May 2020, Green and Wagoner caused GCI to pay Green $1 million, purportedly in repayment of the alleged loan made by Green to GCI. Around this same time, GCI paid $5 million to Carrolton Bank to pay down debt on its line of credit. However, according to GCI records including the GCI Statement of Assets, Liabilities & Shareholders' Equity and Monthly Inventory Statement dated as of May 30, 2020, GCI did not have sufficient revenues to fund a payment to Green of $1 million or a payment to Carrolton Bank of $5 million.

69. Neither Green nor Wagoner disclosed to Hausman that GCI would be making these large payments to Green and to Carrolton Bank. Transactions of this size should have been presented to the Board of Directors, and this is especially true in the case of a payment made by GCI to Green.

**Green and Wagoner Further Exclude Hausman From the Corporation**

70. In early June of 2019, Hausman, in his capacity as a GCI minority shareholder and Director, requested that Trapani, GCI's General Manager, provide him with the date and time of GCI's scheduled month-end inventory. Trapani never responded to Hausman's June, 2019 inventory schedule request.

71. Upon information and belief, Green and Wagoner have ordered GCI employees to prohibit Hausman's access to the Naples Property and to refrain from communicating with Hausman regarding GCI's business.

**Green and Wagoner Fail to Provide Hausman With Access to GCI's Books and Records**

72. On May 26, 2020, Hausman, through counsel, sent a books and records demand to Green and Waggoner. A true and correct copy of the books and record demand is attached as Exhibit A.

73. Hausman had a proper purpose to request access to this information, in that such request was made to protect any and all rights that he may have as a GCI shareholder of record including, but not limited to, properly accounting for material transactions and determining the value of GCI.

74. Green and Wagoner failed to provide Hausman with access to the information he requested.

**Futility of Demand Upon the Board**

75. It would be futile to demand the GCI Board of Directors to assert the claims herein against Green and Wagoner, because Green and Wagoner are the other two of the three members of the Board of Directors and they control the vote.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**

76. Hausman realleges and incorporates by reference paragraphs 1 through 75 above as this paragraph, as if fully set forth herein.

77. Hausman brings this Count I against Green and Wagoner derivatively on behalf of GCI.

78. Green owed fiduciary duties to GCI by virtue of his role as the majority shareholder, a director, and the President of GCI.

79. Wagoner owed fiduciary duties to GCI by virtue of his role as a director, officer, and the General Manager of GCI.

80. By engaging in the foregoing acts and omissions, Green and Wagoner breached the fiduciary duties they owed to GCI.

81. Green and Wagoner's breaches of fiduciary duty proximately caused GCI to sustain damages, including, but not limited to, the lost corporate opportunity to purchase the Naples

Property, the increase in rent for the Naples Property, the excessive amount paid to acquire the use of NG&S's name, the excessive amounts paid to Green's company for information technology services, the loss of sales of Silver Eagles, and the loss of rent owed by Tamiami Inc.

WHEREFORE, James R. Hausman, derivatively on behalf of The Gold Center, Inc., prays for judgment against Todd Green and Joshua Wagoner as follows:

A. Awarding compensatory damages against Green and Wagoner jointly and severally, in an amount equal to the sum of the losses sustained by GCI as a result of their disloyalty, waste, and mismanagement; disgorgement of compensation paid to them during the times they were breaching their fiduciary duties; punitive damages; attorney's fees and expenses pursuant to 805 ILCS 180/40-15; and costs; and

B. Such other and further relief as the Court deems appropriate.

**COUNT II**
**OPPRESSION**

82. Hausman realleges and incorporates by reference paragraphs 1 through 81 above as this paragraph as if fully set forth herein.

83. GCI's shares are not listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national or affiliated securities association.

84. Green and Wagoner have acted, are acting, and will act in a manner that is illegal, oppressive, or fraudulent with respect to Hausman in his capacity as a shareholder and director. *See* 805 ILCS 5/12.56(a)(3).

85. Green and Wagoner are misapplying and/or wasting GCI's assets. *See* 805 ILCS 5/12.56(a)(3).

86. Hausman has been proximately damaged by Green and Wagoner concealing material information from him, and interfering with his rights and responsibilities as a member of the Board of Directors.

WHEREFORE, James R. Hausman, requests the Court to enter the following relief:

A. Setting aside all transactions that were required to be submitted to the Board of Directors but were not, and all self-interested transactions that were not on terms fair to GCI;

B. Removing Green and Wagoner as directors and officers;

C. Appointing other directors and officers and/or a custodian to manage the business and affairs of GCI for the term and under the conditions prescribed by the Court;

D. Ordering Green and Wagoner to mediation with Hausman;

E. Awarding damages to Hausman;

F. Ordering Green to purchase Hausman's shares for their fair value after determining the fair value of the shares, taking into account the impact on the value of the shares resulting from the actions giving rise to this Action;

G. The Court retaining jurisdiction to enforce the purchase order; and

H. Such other relief as the Court deems appropriate.

**COUNT III**
**BOOKS AND RECORDS VIOLATION**

87. Hausman realleges and incorporates by reference paragraphs 1 through 86 above as this paragraph as if fully set forth herein.

88. Hausman has a statutory right to examine the books and records of GCI. See 805 ILCS 5/7.75.

89. Hausman has made a written demand to examine records and has stated with particularity both the records sought to be reviewed and a proper purpose for the demand. See Exhibit A.

90. Green and Wagoner have failed to give Hausman access to the books and records he requested.

91. Green is liable to Hausman in an amount up to ten percent of the value of the shares owned by Green.

WHEREFORE, James R. Hausman, requests the Court to enter an Order:

A. Requiring Green and Wagoner to produce the requested records for examination;

B. Imposing a penalty upon Green Defendants, jointly and severally, in the amount of 10% of the value of the shares owned by Green; and

C. Granting such other relief as the Court deems appropriate.

**COUNT IV**
**ACCOUNTING**

92. Hausman realleges and incorporates by reference paragraphs 1 through 91 above as this paragraph, as if fully set forth herein.

93. Hausman and GCI are entitled to an accounting of the transactions described herein, and all transactions between GCI and Green and/or any company owned or controlled by him.

94. Green and Wagoner have breached their fiduciary duties to Hausman and GCI.

95. Green and Wagoner defrauded Hausman and GCI by actively misleading them and concealing material information while under a duty to speak.

96. Hausman and GCI have a need for discovery of the facts concerning the transactions described herein.

97. Green and Wagoner have intermingled monies between GCI, Tamiami LLC and Tamiami Inc., creating accounts of a complex nature.

98. Hausman is without an adequate remedy at law.

WHEREFORE, James R. Hausman, requests the Court to order Green, Wagoner and Trapani to provide an accounting of the transactions described herein and all transactions between GCI and Green, Tamiami LLC, Tamiami Inc., and/or any company owned or controlled by Green, and granting such other relief as the Court deems appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY OF THE ISSUES HEREIN.**

Dated: October 15, 2020

Respectfully Submitted,

JAMES R. HAUSMAN, individually and derivatively on behalf of THE GOLD CENTER, INC., an Illinois corporation, Plaintiff

By: Hinshaw & Culbertson LLP

By: /s/ *Michael D. Morehead*
Michael D. Morehead

Adam L. Saper #6256627
Hinshaw & Culbertson LLP
151 North Franklin Street
Suite 2500
Chicago, IL 60606
Telephone: 312-704-3000
Facsimile: 312-704-3001
asaper@hinshawlaw.com
*Attorneys for Plaintiff*

Michael D. Morehead #6191779
Hinshaw & Culbertson LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
Telephone: 217-528-7375
mmorehead@hinshawlaw.com
*Attorneys for Plaintiff*