IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

JAMES R. HAUSMAN, individually      )
and derivatively on behalf of THE GOLD )
CENTER, INC., an Illinois corporation, )
                                     )
    Plaintiff,              )
                                     )
v.                                   )    Case No. 20-cv-03276
                                     )
                                     )
TODD GREEN, JOSHUA WAGONER,          )
and THE GOLD CENTER, INC., and Illinois )
Corporation,                         )
                                     )
    Defendants.             )

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Plaintiff James Hausman's ("Hausman") Partial Motion for Summary Judgment (Doc. 100) pursuant to Federal Rules of Civil Procedure 56(a). For the reasons stated below, Hausman's Partial Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

### I.    PROCEDURAL HISTORY

On October 26, 2022, Hausman filed his First Amended Complaint ("FAC"), alleging: Count I – Breach of Fiduciary Duty; Count II – Oppression, pursuant to 805 ILCS 5/12.56(a)(3); Count III – Books and Records Violation, pursuant to 805 ILCS 5/7.75; and Count IV – Accounting. (Doc. 60 at ¶¶ 90-112). On July 25, 2023, Hausman filed a Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 as to Counts I and II. (Doc.

100). On August 25, 2023, Green and Wagoner filed their joint Response and Memorandum of Law in Opposition. (Docs. 107, 108). GCI filed its Notice of Joinder in Response to the Motion for Partial Summary Judgment filed by Defendants Green and Wagoner. (Doc. 109). On September 8, 2023, Hausman filed his Reply in support of his Motion for Partial Summary Judgment. (Doc. 110).

On November 30, 2023, Defendants Green and Wagoner filed a Motion for Leave to File Supplement to Defendants' Memorandum of Law Supporting Response to Plaintiff's Motion for Partial Summary Judgment, to which GCI joined. (Doc. 115). On January 2, 2024, the Court granted Defendants' Motion and Defendants' Supplement was filed. On January 16, 2024, Hausman filed his Sur-Reply in support of his Motion for Partial Summary Judgment. (Doc. 121).

## II.     FACTUAL BACKGROUND

GCI is an Illinois corporation originally formed by Hausman on June 1, 1978. (Doc. 101 at ¶ 1[1]). GCI operates in the precious metal business, including the buying and selling of gold, silver, platinum, palladium, bullion, diamonds, rare coins and currency, sterling silver, and watches. (*Id.* at ¶ 3). On January 31, 2014, Hausman, Green, and GCI entered into a Stock Purchase Agreement wherein Hausman sold and transferred 80% of the common shares in GCI to Green, and retained 20% of the common shares. (*Id.* at ¶¶ 4-5).

---

[1] Unless otherwise noted, the factual background of this case is drawn from Hausman's statement of undisputed material facts (Doc. 101); Defendants' response to Hausman's statement of undisputed material facts and additional material facts (Doc. 108); Hausman's reply to Defendants' additional material facts (Doc. 110); and exhibits to the filings. Defendants agreed with the majority of Hausman's statement of undisputed material facts. Agreed undisputed material facts are referenced by numbered paragraph only, and exhibit citations are used for facts that the Court finds are undisputed from the summary judgment record.

Also on January 31, 2014, Hausman and Green entered into a Shareholders Agreement which stated GCI's Board of Directors would be comprised of between three and five members–namely, Hausman, Green, and Wagoner. (*Id*. at ¶¶ 8-9). Finally, on January 31, 2014, Hausman and Green entered into an Employment Agreement wherein Hausman agreed to serve as the President of GCI and as an advisor to GCI's General Manager. (*Id*. at ¶ 12). The Employment Agreement gave GCI the right to terminate Hausman's employment at any time and for any reason after the first year of employment. (*Id*. at ¶ 14). At Green's direction, GCI terminated Hausman's employment after the first year. (*Id*. at ¶ 15). Following Hausman's termination, Green became GCI's President, with Wagoner serving as its Secretary and General Manager. (*Id*. at ¶¶ 17-25).

After his employment with GCI ended, Hausman alleges he became concerned with several actions taken by Green and Wagoner in the management of GCI. (*Id*. at ¶ 36). On February 15, 2017, Hausman demanded GCI's Board call a Special Meeting to consider 18 proposed resolutions, including expelling Wagoner from GCI's Board. (*Id*. at ¶¶ 58-62). On March 14, 2017, GCI's Board met to consider Hausman's resolutions and Green's newly proposed resolution to empower him to investigate the relocation of GCI's business. (*Id*. at ¶¶ 64-65). At the Special Meeting, Green and Wagoner voted against Hausman's proposed resolutions and in favor of Green's proposed resolutions, allowing Green to "investigate the relocation of GCI's business, including leasing another site, acquiring a vacant site and constructing an appropriate building, or all other appropriate options." (*Id*. at ¶¶ 66-68).

Following the Special Meeting, Green began looking for property to lease, purchase, or build in Naples, Florida. (*Id*. at ¶ 70). On June 1, 2017, Green signed a letter of intent to lease a space in Naples (the "Naples Property") from Baysun LLC ("Baysun"), who indicated it was willing to subsidize GCI's buildout through a tenant improvement allowance. (*Id*. at ¶¶ 74-76). On October 4, 2017, Green, on behalf of GCI, signed a lease with Baysun (the "Baysun Lease") for an initial term of seven years. (*Id*. at ¶¶ 77-78). The lease granted GCI a tenant improvement allowance of $50 per square foot up to a total of $150,350 for GCI to use to build out its leased premises. (*Id*. at ¶ 79). Baysun gave GCI the option to expand the ground floor of the Naples Property and agreed it would not charge GCI rent on any expanded section. (*Id*. at ¶¶ 80-81).

In early 2018, Green learned that Baysun was interested in selling the Naples Property. (*Id*. at ¶ 84). On February 20, 2018, GCI, at Green's direction, submitted an offer to purchase the Naples Property for $5.8 million in cash with no mortgage contingency. (2/20/18 Email Thread and Letter, Ex. 13). Baysun responded that it was not interested in selling the Naples Property for less than $7.1 million. (Doc. 101 at ¶ 88). On May 9, 2018, Green and Baysun entered into a Purchase and Sale Agreement for Green, rather than GCI, to purchase the Naples Property for $5.7 million in cash. (*Id*. at ¶ 89). On May 31, 2018, Green formed Tamiami LLC, becoming its sole member and manager, and caused it to acquire the Naples Property. (*Id*. at ¶¶ 95-96).

On June 1, 2018, the GCI shareholders met and Green presented the Baysun Lease for approval, even though Green had already executed the Baysun Lease months earlier, and without mention that Green or Tamiami LLC were in the process of purchasing the

Naples Property. (*Id*. at ¶ 99). At the June 1, 2018 meeting, Green and Wagoner voted and approved the Baysun Lease while Hausman voting against it. (*Id*. at ¶ 100). Green and Wagoner also voted and approved a proposed $500,000 loan from Green to GCI at an interest rate of 4% with no payments due on the loan until GCI showed at least $700,000 of net profit in the immediately preceding calendar year. (*Id*. at ¶ 103). Green did not recuse himself from either vote. (*Id*. at ¶¶ 100, 105). Following the meeting, Green caused GCI to make a $1 million payment to himself on the loan even though GCI's net profits did not exceed $700,000 in the preceding calendar year. (*Id*. at ¶ 108). Green did not present the $1 million payment request to GCI's Board or shareholders, nor did he tell GCI's Board or shareholders about the opportunity to purchase the Naples Property at any time before Tamiami LLC purchased the Naples Property. (*Id*. at ¶¶ 109-110). Moreover, Green did not present the opportunity to purchase the Naples Property to GCI's Board or shareholders. (*Id*. at ¶ 112).

On June 4, 2018, a special warranty deed for the conveyance of the Naples Property to Tamiami LLC was executed. (*Id*. at ¶ 117). In conjunction with Tamiami LLC's acquisition of the Naples Property, Tamiami LLC and Baysun executed a letter of attornment wherein the tenants of the Naples Property, including GCI, were informed that Tamiami LLC was their new landlord and that they should direct future rent payments to Tamiami LLC. (*Id*. at ¶ 119). Green then caused GCI to build out the Naples Property, increasing the premises from 3,007 square feet to 3,590 square feet. (*Id*. at ¶¶ 121-123).

On November 15, 2018, GCI's corporate attorney wrote a letter to Green's personal Florida attorney, Leo Salvatori, stating, "this structure appears to be usurping a corporate opportunity of The Gold Center, Inc., and working a divestiture of Jim Hausman's ownership/control right in the Florida division of The Gold Center." (11/15/18 Letter, Ex. 32). Agreeing as such, effective January 1, 2019, Green caused GCI to enter into a new lease for 3,590 square feet of space in the Naples Property with Tamiami, LLC (the "Tamiami Lease") although the term of the Baysun Lease had not expired. (Doc. 101 at ¶ 129). Green signed the Tamiami Lease on behalf of both Tamiami LLC, as landlord, and GCI, as tenant. (*Id.* at ¶ 130). Green executed the Tamiami Lease without prior presentation to GCI's Board or shareholders and without disclosure of his interest in Tamiami LLC before execution. (*Id.* at ¶¶ 134-136).

### III.   LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). In determining and evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the party opposing summary judgment and draws all justifiable inferences in his favor. *Id.* "Once the movant has carried this burden, it passes to the non-movant 'to come forward with specific facts showing that there is a genuine issue for trial.'" *McMahan v. Deutsche Bank AG*, 892 F.3d 926, 933 (7th Cir. 2018) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). When

a nonmovant completely fails to prove an essential element of its case, it "necessarily renders all other facts immaterial," and "entitle[s] the movant to a judgment as a matter of law." *Celotex*, 477 U.S. at 322–23. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id*.

## IV.    ANALYSIS

Hausman argues he is entitled to partial summary judgment as to Counts I and II of the FAC. As it relates to Count I, Hausman contends there is no genuine issue of material fact that Green breached his fiduciary duties to GCI by (1) usurping GCI's corporate opportunity to buy the Naples Property and (2) causing GCI to pay Green rent that it was contractually not obligated to pay. As it relates to Count II, Hausman argues there is no genuine issue of material fact that Green and Wagoner have acted, are acting, and will continue to act in a manner that is illegal, oppressive, or fraudulent with respect to Hausman as a shareholder and director under Section 12.56(a) of the Illinois Business Corporation Act of 1983.

### 1.  Breach of Fiduciary Duties

To prevail on a claim for breach of fiduciary duty under Illinois law, a plaintiff must prove: (1) that a fiduciary duty exists, (2) that the fiduciary duty was breached, and (3) such breach proximately caused the injury of which the party complains. *Indeck Energy Servs. v. Depodesta*, 2021 IL 125733, ¶ 47. Corporate officers (such as Green) owe fiduciary duties to their corporations, *Brown v. Tenney*, 125 Ill. 2d 348 (1988), among them is the

duty of loyalty. *Everen Sec., Inc. v. A.G. Edwards & Sons, Inc.,* 308 Ill. App. 3d 268, 276 (3d Dist. 1999). The duty of loyalty prohibits those officers from actively exploiting their positions within the corporation for their own personal benefits or hindering the ability of the corporation to conduct the business for which it was developed. *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 529 (2d Dist. 1993).

The corporate opportunity doctrine prohibits a corporation's fiduciary from misappropriating corporate property and from taking advantage of business opportunities belonging to the corporation. *Advantage Mktg. Grp. v. Keane*, 2019 IL App (1st) 181126, ¶ 23. "A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage." *Dremco, Inc. v. South Chapel Hill Gardens, Inc.*, 274 Ill. App. 3d 534, 538 (1st Dist. 1995). The Illinois Supreme Court has held that it is a breach of fiduciary obligation for a person to seize for his own advantage a business opportunity which rightfully belongs to the corporation by which he is a fiduciary. *Mullaney, Wells & Co. v. Savage*, 78 Ill. 2d 534, 545-46 (1980). Additionally, while a director is not disqualified from dealing with the corporation, "he must act fairly and be free from all fraud or unfair conduct, his transactions will be subjected to the closest scrutiny, and if not conducted with the utmost fairness, to the end that the corporation shall have received full value, they will be set aside." *Vermeil v. Jefferson Trust & Savings Bank*, 176 Ill. App. 3d 556, 562 (3d Dist. 1988) (quoting *Dixmoor Golf Club, Inc. v. Evans*, 325 Ill. 612, 616 (1927)).

In moving for summary judgment, Hausman contends Green breached his fiduciary duty by failing to disclose the opportunity to purchase the Naples Property to

GCI before he purchased the Naples Property for himself. Conversely, Green contends the acquisition of the Naples Property was not a corporate opportunity belonging to GCI because GCI was not in the business of owning real estate. According to Green, this interpretation allowed him to personally exploit the opportunity, thereby creating a genuine issue of material fact as to whether the purchase of the Naples Property truly qualified as a corporate opportunity. In response, Hausman contends that purchasing the Naples Property was in line with GCI's present or prospective business interest and that GCI had the capacity to financially acquire the Naples Property.

In this case, following the March 14, 2017 Special Meeting, Green was specifically charged to lease, purchase, or build a new property for GCI to operate. As such, he took his efforts to Naples, Florida. Upon learning the Naples Property was on the market, Green directed and approved the submission of a letter of intent to purchase the Naples Property on behalf of GCI. (Ex. 1 at 216: 18-22, 130: 16-22, Ex. 13, Ex. 14). While that original offer was rejected by the seller of the Naples Property, Green authorized this original offer to purchase the Naples Property pursuant to his authority as a fiduciary and the President of GCI.

Green does not dispute that, as president of GCI, he was a fiduciary, with a duty of loyalty owed to the company. Nor does he dispute that he approved the submission of a letter of intent by GCI to purchase the Naples Property for the purpose of operating its business in Florida. These facts reveal not only that purchasing the Naples Property was reasonably incident to GCI's present or prospective business, but also demonstrates Green's conduct in purchasing the Naples Property for a lower price – without disclosure

to or consent from GCI – and then leasing the property to GCI for his personal profit. In February 2018, Green submitted an offer to purchase the Naples Property on behalf of GCI. However, Green now contends that purchasing the Naples Property in May 2018, for an even lower price, was not reasonably incident to GCI's present or prospective business. The Court is not persuaded by Green's attempt to create a genuine issue of material fact surrounding GCI's present or prospective business interest. The corporate documents and Green's undisputed conduct surrounding the Naples Property including, but not limited to, submitting an offer to purchase that property on behalf of GCI, establishes purchasing the Naples Property was within GCI's present or prospective business interest.

The next inquiry of the Court is whether it was proper for Green to take advantage of the business opportunity in his individual capacity. In determining whether a director has dealt unfairly with his corporation, courts consider "whether there was a detriment to the corporation as a result of the transaction; * * * and whether there was full disclosure -- although neither disclosure nor shareholder assent can convert a dishonest transaction into a fair one." *Vermeil*, 176 Ill. App. 3d at 562 (quoting *Shlensky v. South Parkway Building Corp.*, 19 Ill. 2d 268, 283 (1960)). When the transaction is challenged, the burden is on the directors involved in the transaction to overcome "the presumption against validity of the transaction by showing its fairness and propriety." *Shlensky*, 19 Ill. 2d at 280.

The determination of good faith relating to a corporate officer seizing a corporate opportunity rests upon the existence of many factors. In *Paulman v. Kritzer*, 74 Ill. App. 2d 284 (2d Dist. 1966), the defendant, as president, was charged with finding a more

desirable location for the operations of his principal, a manufacturing company. *Id.* While searching for property, he personally found and purchased two unimproved tracts of land by using corporate funds to purchase the properties. *Id.* He sold one of the tracts for a personal profit. *Id.* The appellate court found the acquisition of both tracts of land, while searching for property for his corporation, constituted a usurpation of corporate opportunity. *Id.* In so holding, the court reasoned that the corporation was searching for a new location and the availability of the two locations came to the president's knowledge while he was searching for a new corporate property. *Id.* Specifically, in rejecting the officer/director's claim that he had acted in good faith in purchasing, on his own behalf, property in which the corporation would have been interested, the appellate court stated:

> Whether a corporate officer has seized a corporate opportunity for his own depends not on any single factor nor is it determined by any fixed standard. Numerous factors are to be weighed, including the manner in which the offer was communicated to the officer; the good faith of the officer; the use of corporate assets to acquire the opportunity; the financial ability of the corporation to acquire the opportunity; the degree of disclosure made to the corporation; the action taken by the corporation with reference thereto; and the need or interest of the corporation in the opportunity.

*Id.* at 294. These principles were later held by the Illinois Supreme Court to be a correct statement of the law in Illinois. *Paulman v. Kritzer*, 38 Ill. 2d 101 (1967); *Vendo Co. v. Stoner*, 58 Ill. 2d 289, 305 (1974), *cert. denied*, 420 U.S. 975 (1975).

Green argues *Paulman* is inapplicable because the corporate president in that case used corporate funds to purchase the properties. (Doc. 108 at 26). However, the use of corporate funds to usurp a corporate opportunity is only one of the factors considered by courts in weighing whether a fiduciary usurped a corporate opportunity. *Paulman*, 74 Ill.

App. 2d at 294 ("The presence or absence of any single factor is not determinative of the issue of corporate opportunity.").

As previously noted, there was no disclosure to GCI of the opportunity to purchase the Naples Property for $5.7 million. As such, it was impossible for GCI to give its informed consent to Green to act on the opportunity. Green argues there is a genuine issue of material fact as to GCI's ability to purchase the Naples Property. However, his argument is undermined by the undisputed facts. The letter of intent to purchase the Naples Property, authorized by Green on behalf of GCI, made an offer for **"$5,800,000 in CASH, No mortgage contingency."** (Ex. 13 at 3) (emphasis in original). While the seller of the Naples Property rejected GCI's offer to purchase the property for $5.8 million, Green subsequently formed Tamiami LLC and used it to purchase the Naples Property for $5.7 million in cash less than three months later. Despite the authorized offer of GCI to purchase the Naples Property for $5.8 million in cash, Green attempts to now create a genuine issue of material fact by stating GCI did not have the funds to acquire the Naples Property. Green does not dispute or offer any evidence to refute the expert testimony that: (1) GCI could have obtained a loan to finance the acquisition of the Naples Property and (2) the preferable method of financing the purchase was through capital contributions from Hausman and Green, both of whom had the ability to make the contributions at the time of purchase. (Korom Dep., Ex. 25 at ¶¶ 11, 22). Thus, the Court finds there is no genuine issue of material fact as to GCI's ability to purchase the Naples Property for $5.7 million in cash.

As it relates to the third element of a claim for breach of fiduciary duty – that the breach caused damages – Hausman argues Green (1) usurped GCI's corporate opportunity to purchase the Naples Property and (2) caused GCI to pay additional rent on the expanded ground floor of the Naples Property that it was not contractually obligated to pay. Green does not dispute Hausman's allegations of rent payments on the additional square footage. In fact, both Green and Heather McKinney, CPA for GCI, admit that GCI paid additional rent on the 583 square feet that GC was originally entitled to occupy rent-free. (McKinney Aff., Resp. Suppl. Ex. 11).

Under the terms of both the Baysun Lease and Tamiami Lease, GCI had the option to expand the ground floor of the Naples Property and occupy any expansion rent free. It is undisputed that GCI exercised this option and spent over $750,000 to expand the ground floor by 583 square feet. It is also undisputed that GCI has been paying Green's company, Tamiami LLC, rent on the additional 583 square feet that GCI is entitled to occupy rent-free. These rent payments enriched Green at GCI's expense. Green has caused GCI to pay rent on the additional 583 square feet of expanded space that it was not obligated to pay under the terms of both the Baysun Lease and Tamiami Lease. Therefore, there is no genuine issue of material fact that Green's breach of his fiduciary duty of loyalty has caused GCI to suffer damages, with the exact amount to be determined at trial.

Accordingly, under the closest scrutiny applied by the Court, it is clear Green breached his fiduciary duty of loyalty as President of GCI. Green occupied a fiduciary position and owed GCI an obligation to develop corporate opportunities and refrain from

usurping opportunities he gained with his knowledge as President while searching for new property. *See Paulman*, 74 Ill. App. 2d at 297. GCI had a present or prospective interest in purchasing the Naples Property and Green failed to act in good faith by disclosing the opportunity to purchase the Naples Property for $5.7 million in cash. The evidence shows GCI, by its shareholders, had the financial means to acquire the Naples Property. Therefore, no genuine issues of material fact exist as to Green's breach of his fiduciary duty of loyalty.

### 2. Oppression

Section 12.56(a)(3) of the Business Corporation Act provides remedies to shareholders of closely-held corporations where "directors or those in control of the corporation act in a manner that is illegal, oppressive, or fraudulent with respect to" the other shareholders. *See* 805 ILCS 5/12.56(a)(3). Although the Act does not define what types of conduct are "oppressive," the Illinois Supreme Court has stated as follows with regard to the concept of oppression in the context of the Act:

> We have held that the word "oppressive" as used in this statute, does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of "mismanagement, or misapplication of assets," does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with "illegal" and "fraudulent."

*Gidwitz v. Lanzit Corrugated Box Co.*, 20 Ill. 2d 208, 214-15 (1960) (quoting *Central Standard Life Insurance Co. v. Davis*, 10 Ill. 2d 566, 573-74 (1957)). With regard to what type of conduct constitutes oppression, Illinois courts have found that conduct is also oppressive

if it is "arbitrary, overbearing and heavy-handed." *Compton v. Paul K. Harding Realty Co.,* 6 Ill. App. 3d 488, 499 (5th Dist. 1972).

Hausman's reliance on *Gidwitz* and *Compton* to support his argument that Green's actions have oppressed Hausman as a shareholder is misplaced. In *Gidwitz*, the Illinois Supreme Court specifically found oppressive conduct where the president of the corporation used his position to completely control and manage the corporation; violated the corporate bylaws; failed to hold shareholder meetings; falsified corporate records; and took actions without proper authority which included making a personal profit by borrowing money from himself on behalf of the corporation and setting up a separate corporation. 20 Ill. 2d at 214. Unlike in *Gidwitz*, Hausman does not allege that he has been prohibited from participating, according to the amount of his stock, in the selection of GCI's management or that Green and/or Wagoner have falsified corporate records. Additionally, while Hausman has set forth conduct which he states is overbearing and heavy-handed, he does not point to a single instance in which he requested a board meeting and it did not occur. In *Compton,* the appellate court upheld the trial court's decision following a bench trial, finding the actions of the corporate president and manager defendants to be arbitrary, overbearing, and heavy-handed. 6 Ill. App. 3d at 499. Notably, the plaintiff in *Compton* was not only a shareholder, but also an officer of the corporation, both in fact and by a written agreement. *Id.* at 491.

In this case, unlike the shareholder in *Compton*, Hausman has not been officer or employee of GCI since January 31, 2015. Hausman contends he is being oppressed for a variety of reasons, including: Green's dominance on GCI's Board, GCI's lack of

responseto Hausman's concerns of sales of potentially counterfeit coins and stolen merchandise, that Green and Wagoner vote in lockstep to shoot down Hausman's proposed resolutions, and that Green and Wagoner had an "initial plan" to freeze Hausman out of the Florida operations of GCI. But a shareholder in a corporation is entitled to participate in the management according to the amount of his stock. *Jaffe Commercial Fin. Co. v. Harris*, 119 Ill. App. 3d 136, 146 (1st Dist. 1983) (citing *Gidwitz*, 20 Ill. 2d at 215.) That a group of shareholders is able to form a controlling block in a corporation is no indication that this same group is acting oppressively as a matter of law. *Id*. at 146.

While Hausman asserts that Green and Wagoner formulated a plan to freeze him out of GCI when the company moved to Florida, Hausman admits Green and Wagoner never moved forward with that plan. Indeed, as Green and Wagoner point out, it is not an oppressive act for majority shareholders to simply vote their strength. *Jaffe*, 119 Ill. App. 3d at 146; *see also Gidwitz*, 20 Ill. 2d at 215 ("Truly the management is controlled by the stockholders acting through their elected directors, and it is contemplated that the corporation is to be controlled by the majority stockholders.").

Unlike the situation in *Compton*, Hausman has not presented evidence that Green failed to call board meetings, improperly borrowed money from the corporation, or falsified corporate records. *See Compton*, 6 Ill. App. 3d at 499; *Gidwitz*, 20 Ill. 2d 208; *Hager-Freeman*, 229 Ill. App. 3d 262. While Hausman has raised concerns about GCI's business decisions and regular lockstep decision-making on the part of Green and Wagoner, genuine issues of material facts exist as to whether these decisions amount to oppressive

conduct. Although "overbearing and heavy-handed" conduct toward shareholders may constitute "oppression" under the Act, that determination depends upon the specific facts of each case. *See Compton*, 6 Ill. App. 3d at 499. Green's version of events portrays his tactics as aimed at—and succeeding in—increasing GCI's profits by millions of dollars by moving GCI to Florida. (2/15/23 Green Dep., Resp. Ex. 7 at 122:14-17). There also exist questions of fact as to Hausman's claim that he is excluded from management decisions, where Green contends Hausman's attorney has attended various shareholder and director meetings in his place in every year from 2016 through 2021. (Doc. 108 at 30; Resp. Ex. 5, 8/29/16 Board Meeting Minutes). But at summary judgment, the Court may not make credibility determinations or select which inferences to draw. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 892 (7th Cir. 2018). Accordingly, the Court denies summary judgment as to Count II.

## V.      CONCLUSION

For the foregoing reasons, Hausman's Motion for Partial Summary Judgment (Doc. 100) is **GRANTED** with respect to Count I and **DENIED** with respect to Count II. Damages as it relates to Count I will be determined at the bench trial.

ENTER: March 19, 2024

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE