E-FILED
Wednesday, 30 September, 2026 03:19:25 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **JAMES R. HAUSMAN, individually and derivatively on behalf of THE GOLD CENTER, INC., an Illinois corporation,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 20-cv-3276** |
| **TODD GREEN, JOSHUA WAGONER, and THE GOLD CENTER, INC., an an Illinois corporation,** | ) | |
| **Defendants.** | ) | |

# OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

This matter comes before this Court following a bench trial held on the issue of damages. Having heard all testimony, reviewed the proffered exhibits, and considered arguments presented in the parties' post-trial briefs, the Court makes the following findings of fact pursuant to Federal Rule of Civil Procedure 52(a).

## I. PROCEDURAL HISTORY

The Court granted Plaintiff James Hausman's Motion for Partial Summary Judgment and held Defendant Todd Green breached his fiduciary duty owed to The Gold Center, Inc. ("GCI"). The Court reserved its factual determination on damages owed to GCI following a bench trial.

## II. FINDINGS OF FACT

### A. Background[1]

GCI is an Illinois corporation that operates in the precious metals business and was formed by Hausman as its sole shareholder and president. (Doc. 157-1 at ¶¶ 1–4). On January 31, 2014, Hausman, Green, and GCI entered into a Stock Purchase Agreement wherein Hausman agreed to sell and transfer 80 percent of GCI's common shares to Green while retaining the remaining 20 percent of shares. (*Id.* at ¶¶ 5–6). They also entered into a Shareholders Agreement, wherein GCI's Board of Directors would consist of Hausman, Green, and Joshua Wagoner.[2] (*Id.* at ¶¶ 7–8). And, finally, an Employment Agreement was executed wherein Hausman was appointed president of GCI and an advisor to GCI's general manager. (*Id.* at ¶ 13). The Employment Agreement additionally gave GCI the right to terminate Hausman at any time and for any reason after his first year of employment. (Doc. 127 at 3). One year later, GCI terminated Hausman at Green's direction. (Doc. 157-1 at ¶ 14). Green became GCI's president, and Wagoner its secretary and general manager. (*Id.* at ¶¶ 15, 22; Doc. 127 at 3).

Hausman later became concerned with the management of GCI. (Doc. 127 at 3). He demanded the Board meet to consider several proposed resolutions, which included expelling Wagoner from the Board. (*Id.*; Doc. 157-1 at ¶ 27). The Board met and considered Hausman's resolutions as well as Green's resolution that would empower

---

[1] The "Background" subsection summarizes the parties' stipulation of uncontested facts (Doc. 157-1) and the Court's order granting partial summary judgment (Doc. 127).

[2] Joshua Wagoner is dismissed as a defendant in this case per a stipulation agreed to by the parties at the bench trial. (Tr. 75:2–25). Hereinafter, "Defendant" refers to Todd Green.

Green to "investigate the relocation of GCI's business, including leasing another site, acquiring a vacant site and constructing an appropriate building, or all other appropriate options." (Doc. 127 at 3; Doc. 157-1 at ¶ 27). Green and Wagoner, two to one, voted against Hausman's resolutions and in favor of Green's resolution. (Doc. 127 at 3; Doc. 157-1 at ¶ 27).

Green began looking for property to lease, purchase, or build in Naples, Florida. (Doc. 157-1 at ¶¶ 29–31). On June 1, 2017, Green signed a letter of intent to lease a space in Naples from Baysun LLC who indicated it was willing to subsidize GCI's buildout of the Property through a tenant improvement allowance. (*Id.* at ¶¶ 32–34). On October 4, 2017, Green, on behalf of GCI, signed a lease with Baysun on the Property for an initial term of seven years and gave GCI two five-year options to renew (the "Baysun Lease"). (*Id.* at ¶¶ 35–36). The Baysun Lease provided GCI the option to expand the ground floor of the Property and Baysun agreed GCI would not have to pay rent on any expanded space. (*Id.* at ¶¶ 38–39).

In early 2018, Green learned Baysun was interested in selling the Naples Property. (*Id.* at ¶¶ 40–43). Green, acting through GCI, made an offer to purchase the Property for $5,800,000 in cash. (*Id.* at ¶ 44). Baysun counteroffered with $7,100,000. (*Id.* at ¶ 45). Later, however, Green and Baysun agreed to sell the Property to Green—instead of GCI—for $5,700,000 in cash. (*Id.* at ¶ 46). Green then formed 2400 North Tamiami LLC ("Tamiami"), becoming its sole member and manager, and caused it to acquire the Naples Property from Baysun. (*Id.* at ¶¶ 47–49).

After Green's purchase of the Naples Property through Tamiami, he and GCI's other shareholders held a meeting wherein Green presented the Baysun Lease to the Board, despite having already executed the lease and without mentioning that he was in the process of purchasing the Property. (*Id.* at ¶¶ 50–52). The Baysun Lease was approved through Green's and Wagoner's two votes over Hausman's one vote against. (*Id.* at ¶ 53). Green did not present the opportunity to purchase the Naples Property to the Board. (Doc. 157-1 at ¶¶ 60–63).

A special warranty deed for the conveyance of the Naples Property to Green's Tamiami LLC was executed on June 4, 2018, and recorded two days later. (Doc. 157-1 at ¶¶ 64–65). In conjunction with the acquisition, the tenants of the Naples Property, including GCI, were informed that Tamiami was their new landlord and that all future rent payments should be directed to Tamiami. (*Id.* at ¶ 67). Green then caused GCI to build out the Naples Property to increase the premises from 3,007 square feet to 3,590 square feet (an additional 583 square feet). (Doc. 127 at 5).

Green caused GCI to enter into a new lease with Tamiami, effective January 1, 2019, for the 3,590 square feet of space in the Naples Property (the "Tamiami Lease") although the term of the Baysun Lease had not expired. (*Id.*; Doc. 157-1 at ¶¶ 68, 70). Green signed the Tamiami lease on behalf of both Tamiami, as landlord, and GCI, as tenant. (Doc. 157-1 at ¶ 69). The lease was executed by Green without presentation to GCI's Board and without disclosure to the Board of his interest in Tamiami. (Doc. 127 at

6). Thus, GCI became obligated under the Tamiami Lease to pay rent on the additional square footage. (Doc. 157-1 at ¶ 70).

On October 26, 2022, Hausman, acting individually and derivatively on behalf of GCI, filed a four-count amended complaint, which included, as relevant here, a claim for breach of fiduciary duty against Green.[3] (Doc. 60). Hausman later moved for partial summary judgment. (Doc. 100). The Court granted the motion in part, holding that Green breached his fiduciary duty of loyalty and failed to act in good faith by 1) usurping GCI's corporate opportunity to purchase the Naples Property, and 2) causing GCI to pay rent on the 583 square feet of space built out on the Naples Property that it was not obligated to pay under the Baysun Lease. (Doc. 127). A bench trial was held to determine damages.

**B. Damages**

Each party presented two witnesses at the bench trial to determine damages. Plaintiff (Hausman) presented Marc Courey and Randal Dawson, who the Court certified as expert witnesses. Defendant (Green) presented Roy Moloney, certified as an expert witness, and himself, a lay witness. The parties stipulated to the qualifications of the expert witnesses and waived opening arguments. (Tr. 4:15–17).

**i. Testimony of Randal Dawson**

Randall Dawson, a commercial appraiser, was engaged by Plaintiff to determine the market value of the Naples Property (the Gold Center Building) as of May 26, 2023. (Tr. 16:7–8). Mr. Dawson is the Executive Vice President and National Leader of the

[3] The parties later stipulated to dismissal of the remaining claims. (Doc. 144).

Litigation and Support and Dispute Group for CBRE, a global real estate services firm. (Tr. 5:11–25; 6:1–8). Mr. Dawson has over 30 years experience working with commercial property valuations. (Tr. 6:1–8). He inspected the Naples Property, which included the environment around the Property and the lobby area of the Property, but did not include the second floor. (Tr. 10:24; 11:8–15; 67:3–5). The Property, he testified, is a multi-tenant office building with a smaller retail building behind the primary office building, constructed in 1973 and renovated in 2018 and 2019. (Tr. 12:4–13). The building is four stories tall, approximately 26,244 square feet, and is zoned for office use, which, as he testified, was the Property's highest and best use. (Tr. 12:14–17, 21–23; 19:1–18).

Mr. Dawson testified that there are three accepted approaches to value a commercial property: 1) the cost approach; 2) the sales comparison approach; and 3) the income capitalization approach. (Tr. 27:20–25; 28:1–20). The cost approach determines what it would cost to build the building and purchase the land; the sales comparison approach compares a commercial property to others that have similar characteristics, in which adjustments are made for a variety of factors; and the income capitalization approach determines the effective gross potential income after a deduction is made for expenses, divided by the capitalization rate. (Tr. 28:1–20).

In his valuation of the Naples Property, Mr. Dawson chose not to use the cost approach because the age of the property (built in 1973) minimizes the utility of the approach and the approach is not one usually relied on by prospective buyers of commercial property. (Tr. 28:21–25; 29:1–10). Instead, Mr. Dawson used both the sales

comparison and income capitalization approaches. (Tr. 29:11–16). The sales comparison approach valued the Property at $7,850,000 after Mr. Dawson compared seven similar office buildings recently sold in Naples, Florida, and performed adjustments to the data relative to each property, ultimately reaching the median value. (Tr. 32–36; PX 38 at 31, 35–36).

Using the income capitalization approach, Mr. Dawson reached an "as is" value of $7,745,826 which was rounded up to $7,750,000. (Tr. 53:3–18). Under this approach, he first determined the gross potential income of the Property and then deducted the operating expenses—considering comparable properties as well as the subject property's vacancy and credit loss—to achieve a net operating income for the Property ($542,208). (Tr. 38:13–24; 47–21–25; 48:1–3). The net operating income was then divided by 7 percent, representing the overall capitalization rate as determined by Mr. Dawson using a variety of sources, including national surveys and his personal judgment, to reach the "as is" valuation of the Property. (Tr. 48–52:1; 53:3–18).

Having reached two different figures under each approach, Mr. Dawson adopted $7,750,000 as his valuation of the Property. (Tr. 54:8–18). He chose the income capitalization approach, because 1) it is the more conservative valuation and 2) the approach was his primary approach, typically relied on by buyers of commercial properties, in which he utilized the sales comparison approach as a reference to test reasonableness. (Tr. 54:5–25; 55:1–5; 73:23–25; 74:4–7).

**ii. Testimony of Marc Courey**

Plaintiff next called Marc Courey as an expert witness. Mr. Courey is a certified public accountant, fraud examiner, internal auditor, internal controls auditor, compliance and ethics professional, and is certified in financial forensics. (Tr. 77:23–25; 78:1–13). He is also a licensed attorney. (Tr. 78:14–25). He is employed by Wipfli Advisory LLC as a director in forensic and litigation services. (Tr. 77:2–5). He has worked in forensic services and accounting for approximately 22 years and has additional related experience prior to that. (Tr. 78:16–19; 79:1–11).

Mr. Courey was tasked with determining Hausman's and GCI's damages as a result of 1) Green's usurpation of the corporate opportunity to buy the Naples Property and 2) Green causing GCI to pay rent on the 583 additional square feet of space built out on the Property. (Tr. 80:10–15; 84:16–25). Mr. Courey identified the incremental profits that GCI would have received had it purchased the Property. (Tr. 158:5–10; 177:20–25; 178:1–10). In doing so, he evaluated the rental income GCI would have received from tenants of the Property and then subtracted any expenses GCI would have incurred with its purchase and ownership. (Tr. 89:2–25; 90:1–17; PX 39, Ex. E). He additionally accounted for rents that GCI would not have had to pay given its ownership of the building, the interest GCI would have incurred on its loan to purchase the Property, and depreciation of the Property. (Tr. 89:2–25; 90:1–17; PX 39, Ex. E).

In evaluating the rental income GCI would have received if not for Green's usurpation, Mr. Courey relied on existing leases and rent rolls for the Property, as well

as financial information reported by Green on his tax returns for the years 2019 through 2021. (Tr. 105:21–25; 106:1–6; 108:9–19). Those rents were then adjusted to account for the rents GCI would not receive as to the portion of the building it occupies (14 percent of the rentable space). (Tr. 113:3–24). Mr. Courey projected GCI's adjusted rent received for 2022 ($367,900) and then applied a rent escalator of 3.4 percent[4] for subsequent years. (Tr. 110:2–22; 113:17–25; 114:1–10; 115:15–23). He assumed 100 percent leased occupancy of the building in his calculations. (Tr. 111:15–23).

Mr. Courey then adjusted the net income to account for rents not paid by GCI by virtue of its ownership of the Property, interest[5] that would have been incurred by GCI on its loan to purchase the Property and other costs, and depreciation of the Property. (Tr. 104:5–10; 121:13–25; 122:1–8). The adjusted net income was projected through 2043 from the 2022 baseline. (Tr. 113:22–25; 114:1–21). The projection into 2043 was made based on the likely financing term GCI would have received for the purchase. (Tr. 114:22–25; 115:1–11).

Mr. Courey reached a calculation of $6,709,956.00 for the projected incremental profits GCI would have received (through 2043) had it purchased the Naples Property. (Tr. 131:4–14; PX 39, Ex. E). This figure is inclusive of any damages GCI incurred by having to pay rent on the additional square footage built out on the Property. (Tr. 136:7–

---

[4] The rent escalator percentage was derived from the escalators in existing leases at the time. (Tr. 110:2–22).
[5] The interest expense was calculated using the rate indicated by Robin Korom in her report (an expert retained in this matter) for the initial term on the Tamiami Lease (being five years) at a rate of 5.5 percent. Mr. Courey then used an adjusted rate of 9 percent for subsequent years, reducing GCI's overall profits. (Tr. 125–129:1–20).

16). Hausman's 20 percent interest in the projected incremental profits is $1,341,990.00. (Tr. 131:4–14; PX 30, Ex. E). Mr. Courey calculated the present value of that figure, as of May 19, 2023, to be $794,281.20. (Tr. 138:3–14). Multiplying that present value—representing 20 percent of GCI's total present damages—by five produces a value of $3,971,416.00 in GCI's present damages as of May 19, 2023. (Tr. 140:12–19).

**iii. Testimony of Roy Moloney**

Defendant called Roy Moloney as an expert witness. Mr. Moloney is a certified public accountant and the owner of Forge CPA LLC, "a financial consulting firm that specializes in forensic accounting, litigation support, bankruptcies, and receiverships." (Tr. 183:25; 184:1–12). Prior to Forge CPA LLC, Mr. Moloney worked at McHale PA where he was a senior accountant. (Tr. 185:1–9). Gerard McHale[6] prepared reports on behalf of Defendant that Mr. Moloney reviewed in preparation for his court testimony. Mr. Moloney "did a small bit of work" on this case while he was employed at McHale PA. (Tr. 186:10–18).

Mr. Moloney offered several criticisms of Mr. Courey's calculations based on Mr. McHale's reports. Mr. Moloney testified (on behalf of Mr. McHale) that Mr. Courey relied upon "hypothetical assumptions that lacked common sense." (Tr. 188:1–7). On that point, he first testified that it was unreasonable for Mr. Courey to calculate rental income damages from 2019 to 2043 as it is highly speculative and "impossible to predict events

[6] Mr. McHale was previously designated by Defendant as an expert witness but was unavailable at trial due to unforeseen circumstances. The parties came to an agreement that Mr. Moloney would testify only as to the contents of Mr. McHale's reports and offer no new opinions. (Doc. 150-1 at 2).

24 years into the future."[7] (Tr. 188:8–23). He explained Mr. Courey wrongly assumed that all leases active as of 2019 would remain so through 2043 and that commercial rents would increase at a consistent rate over that period. (Tr. 194:6–12). Mr. Moloney commented that these assumptions are all highly speculative. (Tr. 194:6–12). He also stated that Mr. Courey should have included 2018 in his calculations but likely did not because the Property had substantial lost profits that year. (Tr. 188:24–25; 189:1–4; 191:24–25; 192:1–4).

Furthermore, Mr. Moloney (again on behalf of Mr. McHale) testified that Mr. Courey omitted in his analysis a $1.4 million down payment on the Property that GCI would have had to expend, the reduction in principal payments, and any expenses incurred for Green's build-out of the Property. (Tr. 199:17–24). He explained that excluding those expenses from Mr. Courey's profit and loss analysis was in error as the analysis then does not account for the totality of the business transaction. (Tr. 200:13–18). He further explained that those figures would eventually flow through to the income statement. (Tr. 204:12–14). He noted that "profits" under the Shareholder Agreement is poorly defined as they are to be determined by Mario Perrino and Associates, a CPA firm retained by GCI. (Tr. 159:3–13; 204:14–21).

Mr. Moloney testified that Mr. Courey omitted accounting for an opportunity cost incurred by Hausman, given that Hausman never invested any money in the transaction.

[7] Mr. Moloney acknowledged that the expenses calculated for years 2019–2022 were accurate as those calculations are based on Green's tax returns and other existing information. (Tr. 216:3–16). He further acknowledged that the 24-year projection is consistent with a typical amortization schedule on a commercial loan for the type of property. (Tr. 218:18–25; 219:1–3).

(Tr. 205:12–22). Hausman, in other words, could have invested in the Naples Property had GCI purchased it and, in doing so, his net damages would be reduced as he would have financially benefitted from any investment. (Tr. 205:12–25; 206:1–7). Mr. Moloney also criticized Mr. Courey's use of a 3.96 percent treasury rate as being highly speculative and a low rate that unfairly advantages Hausman. (Tr. 206:15–25; 207:1–17). He further stated that Mr. Courey wrongly assumed that the rent was paid based on the Tamiami Lease when it was paid based on the Baysun Lease. (Tr. 208:16–25; 209:1–20). In addition, Mr. Courey omitted including credit loss commissions and re-rental expenses which occur after tenant turnover. (Tr. 211:10–25; 212:1–7). Finally, he stated that it was "very unlikely" that management fees were included in Mr. Courey's analysis.[8] (Tr. 214:3–15).

**iv. Testimony of Todd Green**

Defendant Todd Green testified as a lay witness. Green owns (through Tamiami LLC) the Naples Property that GCI operates out of, among other commercial properties. (Tr. 226:15–25; 227:1–2; 228:22–24). Green purchased the Property primarily so that he could control rents. (Tr. 230:2–8). He paid $5.7 million in cash for it, which he believed was the "right price." (Tr. 230:13–23). He testified that he and his son manage the Property, which includes collecting rents, managing repairs, and "keeping everything updated." (Tr. 231:6–15). He stated, however, that he does not have personal knowledge of the income stream from the Property, he does not routinely review or observe sales or

[8] On cross, Mr. Moloney acknowledged that the expenses came from Green's tax returns and there is no reason to believe Green would not have included those expenses or been inaccurate in his reporting. (Tr. 213–216:2).

listings of commercial properties in Naples, Florida, and he has not had the Property appraised. (Tr. 231:21–23; 236:5–7; 241:13–14).

Green testified to the difficulties and costs in re-leasing from tenant turnover,[9] that commissions are paid to realtors, and that there are periodic remodeling expenses. (Tr. 232:1–25; 233:1–9). He stated that the Property's occupancy level was over 80 percent when he purchased it and is presently in the 70 percent range. (Tr. 239:23–25; 240:1–11). In 2018, $1,290,807.00 in improvements were made to the Property, which included roofing, painting, replacing elevators, changing the front of the façade, and adding stucco. (Tr. 235:4–23; PX 38 at 2). $800,000 was later spent to build out the top floor. (Tr. 234:20–25; 235:1–3). Based on the improvements made since his purchase in 2018, Green testified that $5 to $8 million would be a fair price for the Property. (Tr. 244:12–25; 245:1–6). Despite that, he believes the Property is not worth "a dime more than [he] paid for it." (Tr. 242:22–25; 243:1).

**C. Factual Findings on Damages and Justifications**

The Court finds that Plaintiff has established by a preponderance of the evidence that GCI suffered damages totaling $4,730,609.00. This figure represents the present value of the lost incremental profits caused by Green's usurpation of GCI's corporate opportunity to purchase the Naples Property and his causing GCI to pay rent it was not obligated to pay ($3,971,416.00), plus the appreciated value of the Property ($759,193.00).

[9] Green provided an example of one tenant, Synovus Bank, who vacated their leased space and renewed the lease on a lower floor. The vacated space has not been re-leased. (Tr. 232:1–16; 256:2–4; 262:14–25; 263:1–7).

The Court additionally finds that Mr. Dawson and Mr. Courey are credible and their testimony, in addition to the evidence presented, supported these findings. The Court declines to impose punitive damages because Green's breach of fiduciary duty was not "characterized by wantonness, malice, oppression, willfulness, or other circumstances of aggravation" that would justify punishment. *Tully v. McLean*, 409 Ill. App. 3d 659, 669–70 (1st Dist. 2011) (quoting *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 68 (1st Dist. 2009)).

**i. Lost Income**

The value of GCI's lost income generated by the Naples Property is $3,971,416.00. Marc Courey was tasked with determining the total incremental profits GCI would have received had Green not breached his fiduciary duty owed to GCI by his 1) usurpation of GCI's corporate opportunity to purchase the Property, and 2) causing GCI to pay rent on the additional 583 square feet of the Property. Mr. Courey calculated GCI's future profits, but for Green's breach, as $6,709,956.00. Present damages based on that figure total $3,971,416.00 as of May 19, 2023. That figure encompasses GCI's damages for having to pay rent on the 583 additional square feet, which Mr. Courey valued at $319,046.72. Therefore, Hausman's 20 percent share of the total present damages for lost income is $794,283.20.

Defendant presented testimony from Roy Moloney to rebut Mr. Courey's analysis. Mr. Moloney offered no alternative calculation as to damages or any other figure. Instead, Mr. Moloney offered several criticisms of Mr. Courey's report. Defendant's arguments

are: *first,* Mr. Courey wrongly assumed GCI was paying rent based on the Tamiami Lease when, for 2020 and subsequent years, it paid rent based on the Baysun Lease; *second,* that Mr. Courey wrongly excluded year 2018 from his calculations; *third,* Mr. Courey wrongly assumed 100 percent tenant occupancy; *fourth,* Mr. Courey wrongly excluded expenses related to tenant turnover; and *fifth,* Mr. Courey wrongly extrapolated lost profits through 2043.

Defendant argues Mr. Courey should have calculated damages based on the Baysun Lease rather than the Tamiami Lease, which would have reduced overall damages to GCI. But GCI remains legally obligated to make payments on the Tamiami Lease. (Doc. 157-1 at ¶¶ 64–65, 67–70 ("Under the Tamiami Lease, GCI is paying rent on the additional 583 square feet of space that it built out."); Tr. 180:4–24). The owner that entered into the Baysun Lease with GCI is no longer the owner of the Property, and there is no indication that Tamiami LLC adopted the Baysun Lease—it instead executed the Tamiami Lease with GCI. (Tr. 180:11–19). Because the Tamiami Lease remains a liability for GCI, Mr. Courey explained he calculated damages with respect to rents on the additional space based on that lease.[10]

Defendant contends Mr. Courey should have included year 2018 in his report. The Greens' Schedule E Form reflected a net loss of $635,701[11] that year. (Tr. 163:6–18; PX 59 at 1). Mr. Courey explained that he was unable to perform calculations for 2018 because

[10] The Baysun Lease did not obligate GCI to pay rent on the additional square feet. (Doc. 157-1 at ¶ 71; Tr. 88:9–25; 89:1; 96:15–25; 97:1–3; 99:2–16; PX 39, Ex. C).

[11] Tamiami LLC received $279,623 in rents. (PX 59 at 1). Subtract the total rents received by the total expenses, being $915,324, and the net loss is $635,701. (*Id.*).

he had incomplete information for that year. (Tr. 162:25; 163:1–5).[12] No other testimony was elicited, nor did Plaintiff make any arguments, to support omitting 2018. While Defendant's expert, Mr. Moloney, stated that 2018 should have been included, he did not "know why it wasn't included," and he did not attempt any calculation or provide any figure that would represent new damages. (Tr. 189:2–4). Defense counsel, in argument, attempted to provide a damages calculation using 2018 but used the wrong figures and calculations. For example, he began his calculation using $679,623 in rent received for 2018, but $279,623 was the actual total represented by the Schedule E. (Doc. 162 at 31; PX 59). He also subtracted the 2018 depreciation as well as the total expenses from the total rent received, apparently overlooking the fact that depreciation was already included in total expenses. (Doc. 162 at 31). At any rate, given that the evidence presented is that Mr. Courey's had incomplete information for 2018, there is no reason to doubt the veracity of his testimony, and no reliable calculation or figure was provided in evidence to account for 2018, the Court declines to attempt to perform a calculation with the incomplete information available to it.

Defendant, moreover, argues Mr. Courey wrongly assumed 100 percent tenant occupancy. Defendant states that Mr. Courey should have used the actual percentage as of 2022 and then carry that percentage out through 2043. (Doc. 162 at 31–32). Defendant relies on Green's testimony for the "actual" percentage, in which Green testified, *as of*

[12] Mr. Courey testified that for years 2019 through 2021, he relied on the Greens' Schedule E forms for measuring expenses (and based on his recollection, the base rent and CAM too). (Tr. 162:9–24; PX 39 at Ex. E). It appears that the Schedule E does not represent all the information that Mr. Courey relied on in his calculations. (Tr. 162:9–24; PX 39 at Ex. E).

*November 12, 2025*, the Property's occupancy level is "in the 70 percent range"—close to the highest since his purchase—and was "well over 80" percent when he purchased it in 2018. (Tr. 239:23–25;240: 1–6). On the other hand, Mr. Courey testified that the information available to him from the 2022 leases he reviewed "was that the building was in fact 100 percent leased" although the leases did not account for 100 percent of the space in the building. (Tr. 110:5–21; 111:16–23). He, accordingly, assumed full occupancy for 2022 and then on through 2043. (PX 39 at Ex. E). While he acknowledged that if the actual occupancy were less than 100 percent, it could reduce overall profits, he also explained that "an owner of a building would strive to lease the property all the time." (Tr. 170:1–14). Defense counsel, inclined to use the lowest percentage available, argues that the Court should *assume* 70 percent as the occupancy level through 2043 to reach a new damages figure. (Doc. 162 at 31–32). The Court declines to do so and instead relies on Mr. Courey's sound methodology.

Defendant next argues that Mr. Courey failed to include expenses related to tenant turnover. Those expenses include credit loss, commissions, and re-rental expenses. (Tr. 211:10–12). But based on Mr. Moloney's testimony, he does not know whether those expenses were actually included in Mr. Courey's calculations. (Tr. 213:2–25; 214:1–15). Figures for expenses were taken directly from the Greens' Schedule E forms as part of their tax returns. (PX. 59 at 1). Mr. Moloney acknowledged that the Greens had a duty (and self-interest) to report those expenses with their taxes. (Tr. 215:10–22). It is certainly possible (and likely), then, that the expenses related to tenant turnover are included as

part of those numbers.[13] At any rate, no concrete data was made available to the Court that concerned the "missing" expenses other than Green's testimony that he spent $800,000 to build out the top floor (as cited in argument by Defendant), seemingly having nothing to do with tenant turnover, which would very likely have been included as part of the Schedule E forms and Mr. Courey's calculations. (Tr. 234:20–23; Doc. 162 at 33).

Lastly, Defendant argues that Mr. Courey wrongly projected GCI's lost incremental profits through 2043. Defendant argues that it represents "too long of a period of time" as "a lot of unforeseen risks could arise over that time." (Doc. 162 at 33). Mr. Moloney explained that it was "highly speculative" to assume that tenants would "continue their leases over the next 27 [*sic*] years" and that commercial rents would "increase in a straight line over that time." (Tr. 194:6–12). Mr. Courey explained that his decision to calculate through 2043 was based particularly on a report provided by Robin Korom, an expert retained in this matter, who reported that the financing GCI would have received to purchase the Property would have likely been for a term of 25 years. (Tr. 114:19–25; 115:1–11; 124:20–25; 125:1). Mr. Moloney acknowledged that the 24-year projection was "consistent with the typical amortization schedule on a commercial loan for this type of property," as identified by Ms. Korom. (Tr. 218:18–25; 219:1–6). Defendant did not elicit or offer any additional testimony other than to simply argue the projection

[13] Mr. Courey explained that he did not include those expenses as separate line items for this very reason to avoid double dipping. (Tr. 175:20–25; 176–177:2).

was "too long" and "highly speculative."[14] For these reasons, the Court declines Defendant's request to reduce Mr. Courey's calculation for lost profits.

**ii. Lost Benefit in Appreciated Value**

The appreciated value of the Naples Property is $759,193.00. Randal Dawson calculated this figure by first determining the "as is" value of the asset, using both the cost comparison approach and income capitalization approach, which was $7,750,000.00. After subtracting Green's purchase price of the Property ($5,700,000.00) and the cost of renovations ($1,290,807.00) from the "as is" value, GCI is entitled to $759,193.00 for Green's usurpation of its corporate opportunity to purchase the Property.

Defendant offered four criticisms of Mr. Dawson's analysis. *First*, Mr. Dawson is less credible than Todd Green to value the Property because Mr. Dawson is in Illinois and does not have a Florida appraiser's license, whereas Green has commercial real estate experience in Naples, Florida (although holding no appraisal license of any kind and is self-interested); *second*, Mr. Dawson's inspection of the building was incomplete—he did not inspect the second floor—and thus he improperly assumed 100 percent occupancy of the building; *third*, Mr. Dawson should have used the cost approach to determine the value of the Property because, as Defendant argues, the Property had substantial unique improvements since Green's purchase; and *fourth*, Mr. Dawson's use of the sales

---

[14] Defendant, in argument, invites the Court to calculate and project damages from 2018 to 2025 based on the 7-year initial term of the Baysun Lease. (Doc. 162 at 33). Defendant, however, neglects to mention that the lease (as well as the Tamiami Lease) offered two 5-year renewals. Defendant neither explains why Mr. Courey's decision, consistent with the findings of Ms. Korom, to project to 2043, is incorrect beyond that it relies on speculation which Mr. Courey acknowledged. (Tr. 164:12–18; Doc. 162 at 33).

comparison approach is inapplicable because he compared commercial office buildings to the Property whereas GCI "is a precious metals business, not an office." (Doc. 162 at 28).

Mr. Dawson, however, has had a temporary Florida appraisal license before, is able to take assignments in Florida, did not need a temporary license for this property, and has conducted dozens of commercial appraisals in Florida throughout his career. (Tr. 7:3–25; 8:1–18). Moreover, despite having conducted no inspection of the second floor of the Property, Mr. Dawson explained that because he accounted for market vacancy in his analysis, the actual tenant occupancy would not change his findings. Specifically, although he assumed 100 percent occupancy (because he did not have access to all the leases), he subtracted from the total income 6 percent, the submarket vacancy rate, consistent with a market analysis and the Uniform Standards of Professional Appraisal Practice to determine the fair market value of the Property. (Tr. 21:9–25; 22:1–11; 39:17–25; 70:1–12).

Further, Mr. Dawson chose not to conduct a cost approach calculation to value the Property based on the age of the Property (built in 1973) and because "buyers in the marketplace typically do not rely on the cost approach for the valuation indication for an office building that is income producing." (Tr. 17:12–21). Instead, they "rely most heavily on the income capitalization approach and [] use the sales comparison approach . . . [as] a sanity check to determine if the indication by the income approach is reasonable." (Tr. 17:12–16). That is the analysis Mr. Dawson conducted based on his wealth of experience

appraising commercial properties. Defendant does not rebut the last point concerning typical buyers but argues adding stucco to the building is one substantial, unique improvement that modernizes its age, making the cost approach the most applicable method to value the Property. Defendant offers no testimony supporting that argument. Mr. Dawson explained that adding stucco is merely a feature, not one that moves the needle. (Tr. 73:9–22). He added that the total cost of the renovations ($1.3 million) was not substantial enough to mandate any development of the cost approach. (Tr. 73:18–22). As to Defendant's last argument, the Property is zoned for office use. (Tr. 12:21–23). The undisputed highest economic use of the Property is an office and that's what the Property is being used for. (Tr. 19:8–22).

Green's testimony concerning the value of the Property is underwhelming in comparison. As said, notwithstanding Green's interest in the case, his qualifications are dwarfed by Mr. Dawson's. While Green is the owner of the Property, and purchased it for $5.7 million, he is not licensed in any state to appraise commercial property and, of course, did not attempt to reproduce any of the figures reached by Mr. Dawson in order to determine the Property's fair market value. For example, he did not determine the net operating income, or its highest and best use, nor did he apply any of the three valuation approaches. (Tr. 253:16–25; 254; 255:1–11). At any rate, while Defendant believes the Property is not "worth a dime more than [he] paid for it," he also stated that a price between $5 to $8 million would be a fair market value of the Property given the renovations. (Tr. 242:22–25; 243:1; 244:12–25; 245:1–10). Mr. Dawson's $7,750,000.00

valuation happens to fall within that range. Therefore, for the reasons stated, GCI is entitled to $759,193.00 in damages related to its lost benefit in the appreciation of the Naples Property. Hausman's 20 percent share equates to $151,838.60.

## III. CONCLUSION

Based on the foregoing reasons, the Court enters Judgment in favor of Plaintiff and against Defendant Todd Green, and awards The Gold Center, Inc., $4,730,609.00 in compensatory damages with interest, as consistent with this Opinion. Clerk is directed to terminate Defendant Joshua Wagoner as a party to this case and enter Judgment against Defendant Todd Green, closing this case.

ENTER: September 30, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE